OPINION OF THE COURT
Arthur J. Abrams, J.
In this proceeding commenced pursuant to Family Court Act § 236, the petitioner, Karen J. F., seeks an order of this court directing that her child, Anthony, date of birth Decern *509 ber 29, 1990, receive certain enumerated special education and related services during the period between September 10, 1992 and June 23, 1993, and, further, that the cost of said services be made a charge upon the County of Suffolk.
The petition bearing docket number H-133-93, as verified on August 4, 1992, alleges that the subject infant is speech impaired and "in need of’ special education services from the BOCES II (Suffolk County) Infant-Toddler Program. The cost of these services, as set forth in the petition and accompanying documentation, is $26,773, which, if authorized by the court, would become a charge upon the County of Suffolk under Family Court Act § 236, subject to partial reimbursement by the State under Education Law § 4406.
Upon review of the petition by the County of Suffolk, an objection was interposed, albeit to the extent of the educational services being requested by the petitioning parent. The entire matter was referred for a hearing, whereupon the service provider, BOCES II, and the payor, County of Suffolk, were granted leave to intervene as interested parties in the proceeding.
The matter was heard over the course of several days, with each party offering testimonial and/or documentary evidence in support of their respective claims. The petitioner parent, and the intervener, BOCES II, claimed that the nature and extent of the child’s speech disability was such that he was entitled, under the law, to receive a full range of services consisting of speech therapy, as well as a center-based preschool education program at the Wing Learning Center, operated by BOCES II. The intervener County, on the other hand, claimed that the child’s disability was such that a program of speech therapy alone would be suitable and/or appropriate. The contention that the child was "speech impaired” and otherwise entitled to services under Family Court Act § 236 was not challenged. Indeed, the dispute between the parties related only to the level of services to be furnished to the child, albeit within the context of same being "suitable” under the attendant circumstances.
In relevant part, the governing statute, to wit, Family Court Act § 236 (2), states: "Whenever such a [handicapped child] within the jurisdiction of the court pursuant to this section appears to the court to be in need of special educational services * * * a suitable order may be made for the education of the child in its home, a hospital, or other suitable institution.”
*510 It bears noting at the outset that the court’s power under Family Court Act § 236 includes the power to approve or to deny, in whole or in part, the type of services being requested on behalf of the child. Indeed, in Matter of Schwartz v County of Nassau (111 AD2d 242 [1985]), the Appellate Division, Second Department, specifically held that the Family Court is empowered to rule on the factual and/or legal issues surrounding the suitability of the education program (and educational facility) selected by the parent on behalf of the child. Notably, the Court stated (at 243): "We conclude that because of the existence of substantial factual issues concerning * * * the continued suitability of the program or facility chosen, the Family Court should not have granted summary judgment.”
The operative word in this matter is "suitable”, which is utilized, but not defined in the statute and relevant decisional law. In the case at bar, the petitioner’s (and BOCES’) assessment of what is educationally "suitable” for the child is quite different from that of the County. Clearly, the court’s interpretation of the term "suitable”, as it is used in the statute, will directly affect the disposition of this litigation. Unfortunately, the court has not uncovered (nor have the parties presented) any reported decision that purports to define or give meaning to the term "suitable”.
In this regard, the court finds it significant that Family Court Act § 236 — as well as the petitioner’s own verified pleading — contain the phrase "in need of’, in reference to the child’s request for the stated educational services. The statute alludes to a child being in need of special educational services, whereas the petition alleges that the child is in need of the following (therein enumerated) services. In the court’s mind, there is clearly a legislatively created nexus between the words "need” and "suitable”, as utilized and juxtaposed in the statute. The plain and ordinary meaning of the statute’s words — as well as the structure of the statute itself — clearly suggests that the suitability of the order for educational services is entirely interwoven with the establishment of the "need” for such educational services.
Indeed, if the court’s disposition of the petition were to be measured by the words "beneficial”, "helpful”, or "advantageous” (as purportedly being synonymous with "suitable” or "needed”), there would never be a limitation of services, and every child with special needs would receive an unlimited spectrum of optimum services, under the theory that such services are "suitable”. That being the case, every such child *511 would receive a blank check for his or her educational "needs”. It is hard to contemplate any child who would not benefit from the broadest and most comprehensive educational and psychiatric services known to our society. This court cannot believe that the Legislature of this State intended such a financially catastrophic interpretation of the statute.
The court therefore determines that its power under section 236 should be exercised upon a standard relating to the need for the requested educational services. Stated in question form, does the evidence establish that the requested services are needed by the child vis-á-vis his or her particular impairment or disability? This is a far cry from asking whether the child would "benefit”, or be "assisted”, by the rendition of the requested services. As noted, the latter question would always be answered in the affirmative, which is clearly not what Family Court Act § 236 envisions.
Having set forth the issue in general terms, the time has come to discuss the specifics of the petition herein.
Petitioner Karen F., Anthony’s mother, was the first witness called and she testified that Anthony had long suffered from chronic ear infections, otitis media, and that, on June 29, 1992 her son had had a bilateral myringotomy, evidenced by tubes, when she brought Anthony to BOCES II for his special education evaluation. She further testified that prior to the July 29, 1992 evaluation, Anthony had been acting aggressively, throwing things, having temper tantrums, and pointing and making gestures to make his needs known. Still further, Mrs. F. stated that when Anthony was seen by the BOCES II evaluators the boy did not sit still.
BOCES II called as its primary witnesses Denise D’Onofrio-Zizzo, a special language psychologist, and Dr. Robert H. Meyer, a school psychologist; both had served as members of the BOCES II Arena Assessment Team which evaluated Anthony on July 29, 1992. The aforesaid witnesses prepared and submitted reports in support of a center-based program, the said reports were marked in evidence as petitioner’s exhibit 3 (D’Onofrio) and petitioner’s exhibit 4 (Meyer). Ms. D’Onofrio testified that during the evaluation, Anthony was age-appropriate in play, had a short attention span, was easily distracted, was quickly confrontational, spat and required constant attention. She stated that she commenced but discontinued the Peabody Picture vocabulary test due to Anthony’s inability to comprehend the test task. She also administered *512 the Expressive One Word Picture Vocabulary test, but no more successfully, as she found the child’s "expressive vocabulary delay” to be moderately depressed and greater than six months below chronological expectations. The final test administered was the REEL II, which consisted of questions relative to the child’s behavior posed by the speech pathologist to Mrs. F. Ms. D’Onofrio determined that Anthony had severe speech and language deficits.
Worth noting, Ms. D’Onofrio found Anthony had no cognitive deficit and possessed a normal intelligence range. She stated that there had been no audio-metric screening or any tympanmetry testing. She averred that children who do not have a hearing problem can have a bad day and stated that she did not believe another test of Anthony would serve any purpose. What this was intended to convey is unclear. If Ms. D’Onofrio meant to say that Anthony did not have a hearing problem, then the balance of her testimony makes little sense and does not explain why a retesting might not prove to be helpful. On the other hand, if the implication was that Anthony had, or may have had, a hearing problem, why did not BOCES II have the child submit for auditory screening? After acknowledging that she possessed no expertise in hearing matters, the witness stated that the bilateral myringotomy did not impact her recommendation of a center-based program because of Anthony’s severe language deficits and otitis media, adding that otitis media can have a lot of effects on a child, she said that Anthony needed a total communication to cope with his audio deficits, a combination of sign language and spoken words. To this was added that once the ear fluid was removed, the boy should hear normally. Ms. D’Onofrio explained that additional center-based program benefits would be audiological screening upon program entry and the monitoring of the child’s otological status. The speech pathologist concluded with the comment that her judgment as to Anthony’s needs had been made in collaboration with Dr. Meyer, the school psychologist.
The constant references to Anthony’s hearing is hard to comprehend in the context of BOCES II’s failure to have an audio screening, particularly in view of the then recent bilateral myringotomies. Put succinctly, did Anthony still have a hearing problem and would the answer to that inquiry affect his need for special education and, if so, to what degree?
Dr. Robert H. Meyer stated that he was a member of Anthony’s Assessment Team and that the evaluation was *513 stressful to Anthony. The doctor noted in his report that the boy’s play behavior was constructive and age-appropriate, that during the test administration Anthony sat in his mother’s lap and carried out the various tasks presented to him in a conscientious manner. The boy appeared to enjoy the attention paid to him and responded well to praise as well as words of encouragement. On the Leiter International Performance Scale Anthony scored within the above average range (IQ 110). His basal age was at the two-year-old level whereas his ceiling age was at the four-year-old level.
Dr. Meyer related that in the assessment no cognitive deficits emerged nor are any suspected based on his clinical observation and impression.
The doctor in his report described Anthony’s verbal fluency as limited, whereas on the witness stand he used the word severe; the witness said that it was because of such severity that he recommended a center-based program.
There was considerable testimony as to whether Dr. Meyer signed the petition before or after he evaluated the child, the court accepts the doctor’s statement that regardless of the dates on the pertinent documents that the report followed the evaluation.
Dr. Meyer eliminated Anthony being autistic, emotionally disturbed, learning disabled, mentally retarded and deaf; he did not, however, rule out the child being hard of hearing. The school psychologist said that Anthony’s hearing contributed to his condition and that, to the doctor’s knowledge, the hearing problem had been addressed. Dr. Meyer acknowledged that on occasion Arena Assessment Teams brought in an expert but that no such expert, i.e., an audiologist, had been retained in this matter. This court finds unfathomable both the failure to employ such an expert and the want of an explanation for such oversight or practice. We were taken by the inconsistencies in Ms. D’Onofrio’s testimony and report, the inconsistencies in Dr. Robert Meyer’s testimony and report and the inconsistencies between the testimony of the said speech pathologist and school psychologist.
The County called one witness, a Dr. Janice Orland who is the Director of the Bureau of Services for Children with Disabilities, Suffolk County Department of Health. Dr. Orland accurately pointed out that no proof was elicited as to Anthony’s hearing loss, if any, but admitted that the County also had never specifically sought an audiological screening. The *514 doctor referred to discrepancies between Ms. D’Onofrio’s and Dr. Meyer’s testimony to which the court previously alluded. She also criticized BOCES II’s failure to retest Anthony. She posed the unanswered question, was the alleged otitis media rectified by the ear surgery? She challenged Ms. D’Onofrio’s recommendation of total communication to compensate for Anthony’s auditory deficit by asking what established deficit? A final observation, we do not comprehend Dr. Orland’s statement that it would not have been helpful if we, the County, had been more specific in soliciting information regarding our, the County’s, concerns about Anthony’s hearing. The court always thought that more knowledge was preferable to less.
The petitioner’s presentation was chock full of gaps, inconsistencies and unknowns, thus leaving the court in the position of having to guess and/or speculate whether the requested center-based program is suitable, as opposed to a program of speech therapy only. We cannot find, on the record herein, that the petitioner has established, by a fair preponderance of the evidence, the requisite need for a center-based program for the child Anthony. Accordingly, the petition is dismissed.